UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROUMMEL JEROME INGRAM,

                        Plaintiff,                              Civil Action No. 22-10434

v.                                              David M. Lawson
                                              United States District Judge

SERGEANT ZAMENSKI,                    David R. Grand
                                            United States Magistrate Judge

                            Defendant.

_____/

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 29)

*Pro se* plaintiff Roummel Jerome Ingram ("Ingram"), an incarcerated person, brings this civil rights action pursuant to 42 U.S.C. § 1983, against Michigan Department of Corrections' ("MDOC") employee, Sergeant Heather Zamenski ("Zamenski"), asserting that she violated his Fifth and Fourteenth Amendment due process rights by sanctioning him with loss of privileges for an out-of-place misconduct without providing a proper misconduct hearing, and by arbitrarily placing him to punitive segregation because she disagreed with his attempt to exercise his right to a hearing.  (ECF No. 1).[1]  The case was referred to the undersigned for all pretrial matters pursuant to 28 U.S.C. § 636(b).  (ECF No. 12).

---

[1] On March 21, 2023, the Court issued an Order dismissing Ingram's First and Eighth Amendment claims for failure to exhaust his administrative remedies.  (ECF No. 20).  Accordingly, this Report and Recommendation will focus only on the salient facts relating to his remaining due process claims.

On October 10, 2023, defendant Zamenski filed a Motion for Summary Judgment. (ECF No. 29). Ingram filed a response to this motion, and Zamenski filed a reply. (ECF Nos. 31, 32).

Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody. *See* E.D. Mich. LR 7.1(f). Here, the Court finds that the facts and legal issues are adequately presented in the briefs and on the record, and it declines to order a hearing at this time.

## I.     RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that defendant Zamenski's Motion for Summary Judgment **(ECF No. 29)** be **GRANTED IN PART AND DENIED IN PART.**

## II.    REPORT

### A.     Background

#### *The Complaint*

In his complaint, Ingram alleges that, on January 9, 2022, he was called to ARF's "control center" so that Zamenski could review with him a "Class II Out of Place Misconduct" (the "Out-of-Place Misconduct Ticket") he had previously received. (*Id.*, PageID.7-8). Ingram alleges that, upon his arrival, Zamenski "read the [misconduct] ticket and asked [him] how [he would] plead." (*Id.*, PageID.7). Ingram "pled not guilty and requested a hearing on the misconduct," but Zamenski allegedly "got upset" and replied, "No, this is your hearing." (*Id.*). Ingram then responded that "it wasn't possible that this was [his] hearing because per policy a hearing being held in such a manner was prohibited,"

2

but Zamenski "became irate, wrote a sentence of 15 days on the misconduct ticket and handed it back to [him]." (*Id.*). Ingram alleges that he then "retrieved the misconduct and attempted to leave" before Zamenski turned to one of her fellow officers and said, "He needs to be restrained." (*Id.*). Ingram was allegedly "told to sit back down" and "eventually taken to segregation for no valid reason." (*Id.*). He alleges that, "[l]ater that night[,] Sgt. Zamenski wrote a false misconduct on [him] to try to cover up her actions." (*Id.*).

Based on the above allegations, Ingram claims that Zamenski violated his Fifth and Fourteenth Amendment due process rights "by giving [him] 15 days LOP at the misconduct ticket review and refusing [him] a hearing despite the fact that [he] pled not guilty and requested a hearing" on the Out-of-Place Misconduct Ticket, and "by arbitrarily sending [him] to punitive segregation simply because she disagreed with [his] attempting to exercise [his] right to a hearing." (*Id.*, PageID.9). Ingram alleges that, "[a]s a result of being wrongfully sent to segregation," he was "driven into a manic episode and caught several misconducts" and "tested positive for COVID-19 shortly afterwards." (*Id.*, PageID.11). He seeks money damages against Zamenski in her official and individual capacity. (*Id.*, PageID.2, 11).

### *Summary Judgment Evidence*

Ingram's MDOC medical records reflect that "Prisoner Ingram has been receiving mental health services since 2010." (ECF No. 1, PageID.23). It is noted that Ingram had "multiple previous admission[s] to Crisis Stabilization Programming" ("CSP"), starting from October 13, 2010, when Ingram presented as "delusional and bizarre." (*Id.*). MDOC

medical records note that Ingram "has a history of suicidal behaviors in the recent past," and that he is "unpredictable due to his decompensated mental state, and therefore, is at risk for harm to self and/or others." (*Id.*). After being placed on psychotropic medication, Ingram's symptoms improved such that he was discharged from Residential Treatment Programming in November 2010. (*Id.*). Ingram was noted as doing "well until 2014 where is it noted that he spends a lot of time in segregation," and he was then placed into Secured Status Outpatient Programming (SSOPT). (*Id.*). In November 2017, Ingram was again referred to CSP "after attempting to go without being on psychotropic medication," and it was documented that Ingram "has been presenting with manic symptoms including confusion, pressured speech, banging [] on his cell door to the point of causing swelling, [and] flight of ideas. Mr. Ingram had been stable up until this week when I called him in based on officers report that he was engaging in unusual behavior. Mr. Ingram does not get tickets, but he was found wandering around places that he would not normally occupy." (*Id.*). Ingram responded well after being re-started on psychotropic medication and was discharged from RTP in January 2018, and in May 2019 was discharged from RTP and placed in OPT. (*Id.*).

On November 16, 2021, Ingram was assigned an "OPT mental health case manager" for "regular case management sessions," during which Ingram admitted being "non-complaint with his prescribed mood stabilizer" for the past several weeks after he became aware of the possible side effects of such medication. (*Id.*, PageID.22). Ingram's OPT case manager "made attempts at helping [him] understand the importance of medication compliance, as it related to his bi-polar diagnosis," but "despite multiple attempts by his

assigned OPT case manager," Ingram "continued to refuse his medications."  (*Id.*).

On January 9, 2022, Correctional Officer K. Pickford issued Ingram the Out-of-Place Misconduct Ticket for "Disobeying a Direct Order" when she observed Ingram out of place walking down the B-wing and ordered him to "[s]top and return to your cell," but he refused.  (ECF No. 29-2, PageID.312).  The misconduct ticket reflects that Zamenski attempted to review the misconduct ticket with Ingram, but he "[r]efused to participate," he did not waive 24 hour notice of a hearing, and his hearing date was scheduled for "1/11/22."  (*Id.*).  Under "Sanctions Imposed (Hearing Investigator enters begin and end dates for Class II misconducts)," there is a notation for "15" days loss or privileges, but the begin and end dates are left blank.  (*Id.*).

Later that same day, on January 9, 2022, Zamenski issued Ingram a separate misconduct ticket for a Class I misconduct of "Creating a Disturbance (432); Disobeying a Direct Order (420)" (the "Disturbance Misconduct Ticket").  (ECF No. 15-4, PageID.125 (noting misconduct report was "Elevated to Class I at review" and "rereviewed due to clerical error" on "1-15-2022")).  The Disturbance Misconduct Ticket states that Ingram "was being read on a Class II Misconduct for Out of Place," when he "began interrupting and arguing with [Zamenski] about the ticket."  (*Id.*).  It states that Ingram was then "given the direct order to leave the Control Center Lobby and return to his unit," but when he "continued to argue with [Zamenski] and refused to leave," he was "directed to the control center lock cage and interviewed by Segreant Lee."  (*Id.*).  Ingram was then "directed to come to the door of the cage to be placed in restraints and refused to be restrained."  (*Id.*).  Under "Status Pending Hearing," the Disturbance Misconduct Ticket reflects that Ingram

was sent to "Segregation," rather than "Confinement to Cell/Room." (*Id.*).

Ingram appears to have decompensated fairly quickly after being placed in segregation, and attempted suicide within the first two days of that placement. Relevant here, MDOC medical records state:

> On 1/10/2022, prisoner Ingram's case manager documented the following in a restrictive housing note: "Prisoner Ingram was evaluated while in restrictive housing. He was placed in restrictive housing yesterday after becoming argumentative with an officer reviewing on a misconduct which led to him refusing a direct order to be restrained and taken to segregation for a cool down period. Prisoner Ingram was calm, cooperative, and oriented x4. His affect was congruent with conversation, speech was rapid, and maintained good eye contact. Prisoner Ingram was initially observed by this clinician sitting on a plastic chair which had been placed [on] top of his bed staring out the cell door window. He was then escorted out of his cell by custody staff for out of cell assessment. Prisoner Ingram explained there was misunderstandings between him and custody which resulted in his misconduct tickets. Prisoner Ingram reported that his mental health is good and has no concerns . . .
>
> On 1/10/2022, the medication provider assessed prisoner Ingram and noted significant signs and symptoms of mania. The provider discontinued the Depakote and prescribed Abilify to slow and hopefully reverse the decompensation. On 1/11/2022, prisoner Ingram was found by custody staff in the process of fashioning a noose (using a bed sheet) to hang himself. Prisoner Ingram was immediately removed from his cell, placed into an observation cell and a HIGH risk suicide management plan was initiated. On 1/21/2022, prisoner Ingram returned to general population.

(ECF No. 1, PageID.22-23).

Additional details regarding Ingram's time in segregation are contained in an MDOC "Misconduct Sanction Assessment" form dated January 18, 2022, which states that Ingram was assessed by "J. Forgiel MA, LLP" as having a "mental disability and/or mental limitations" in the form of a "disorder of thought and/or mood, which may impact day-to-

6

day functioning." (ECF No. 29-2, PageID.313). It was also determined that Ingram's mental disability "had an[] [e]ffect on the conduct alleged in the misconduct by the prisoner" because Ingram "has been refusing his prescribed psychiatric medication and has decompensated substantially as a result," and "[h]is ability to consider the consequences of his actions has also been greatly reduced." (*Id.*). Finally, it states that "[d]ue to [] Ingram's decompensated mental state, further sanctions would possibly be detrimental to his overall mental health." (*Id.*).

That same day, on January 18, 2022, Hearings Investigator Lawson wrote two memos to Deputy Warden McRoberts, one concerning a "Request to dismiss misconduct subsequent to review" of the Out-of-Place Misconduct Ticket (ECF No. 29-3, PageID.318), and the other concerning the same request to dismiss the Disturbance Misconduct Ticket (ECF No. 15-4, PageID.124). Both memos state that "during the investigation process, errors/problems were discovered which will result in a NOT GUILTY / DISMISSAL finding." (ECF No. 15-4, PageID.124; ECF No. 29-3, PageID.318). Under "Reason(s)," the memos state that Ingram was "seen by QMHP[.] It has been determined that Ingram [] is not responsible for his actions due to a decompensated mental state. This will result in a NOT GUILTY/DISMISSAL finding," and that "[i]t is respectfully requested that the misconduct be pulled for the above stated reason." (*Id.*). The memos were signed and approved by Deputy Warden McRoberts on January 19, 2022, and, as noted above, Ingram was returned to the general prison population on January 21, 2022. (*Id.*; ECF No. 1, PageID.23).

Zamenski submitted a declaration attesting to the incident at issue in this case. She

7

avers that, on January 9, 2022, she reviewed a misconduct ticket issued by ARF Corrections Officer K. Pickford against Ingram.  (ECF No. 29-2, PageID.308).  Zamenski avers that, during the review of this misconduct ticket, she "offered Ingram sanctions of 15-day Loss of Privileges (LOP) if he would plea[d] guilty and waive his right to a hearing, and [Zamenski] documented the proposed sanctions on the [Out-of-Place Misconduct] Ticket itself."  (*Id.*, PageID.308-09).  She avers that while she was reading the misconduct ticket, Ingram interrupted her, refused to participate in the review, and became disruptive.  (*Id.*, PageID.309).  As a result of his behavior, Zamenski issued him the Disturbance Misconduct Ticket for "Creating a Disturbance" and "Disobeying a Direct Order" later that same day.  (*Id.*).  She avers that she did not impose a sanction of 15 days LOP because, pursuant to MDOC policy, she "could not have imposed *any* sanctions if Ingram did not plead guilty and waive his right to a hearing . . ."  (*Id.*) (emphasis in original).  She avers that, "[b]ecause I could not and did not impose any sanctions during my review of the ticket, and because the [Out-of-Place Misconduct Ticket] was pulled before a misconduct hearing was ever held, Ingram would not have served any sanctions arising out of the [Out-of-Place Misconduct Ticket]."  (*Id.*).  However, Zamenski does not contest Ingram's assertion (ECF No. 1, PageID.8-9) that *she* sent him to segregation following her issuance of the Disturbance Misconduct Ticket.  (ECF No. 29-2, PageID.308-09).[2]

Defendant Zamenski now moves for summary judgment on Ingram's Fifth and

---

[2] In his response brief, Ingram reiterated that he "was wrongfully placed in segregation ***by Defendant Zamenski*** . . ."  (ECF No. 31, PageID.341) (emphasis added).  Zamenski did not factually contest that assertion in her reply brief, nor has she argued a lack of personal involvement in the decision to send Ingram to segregation.

Fourteenth Amendment claims against her.

## B.    Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative

showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

### C.    Analysis[3]

Zamenski argues that summary judgment is warranted on Ingram's official-capacity claims against her based on sovereign immunity, and on his individual-capacity claims against her because his classification to segregation and claimed loss of privileges was not a "significant and atypical" hardship, such that his Fourteenth Amendment due process claims fail as a matter of law.  The Court addresses each in turn.

### **Official Capacity Claims**

Zamenski argues that Ingram's claims against her in her official capacity for money damages must be dismissed under sovereign immunity.  (ECF No. 29, PageID.301).  The Court agrees.

The Eleventh Amendment prohibits suit in federal court against the state or any of its agencies or departments unless the state has waived its sovereign immunity.  *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984).  Relevant to this case, the Sixth Circuit has specifically held that MDOC employees are entitled to sovereign

---

[3] In her summary judgment motion, Zamenski argues that Ingram's Fifth Amendment claim must be dismissed because "the Fifth Amendment's Due Process Clause circumscribes only the actions of the federal government," and Ingram "does not allege that Zamenski was associated with the federal government."  (ECF No. 29, PageID.291-92).  In his response brief, Ingram represents that he "is in agreement with Defendant that the Fifth Amendment's Due Process Clause circumscribes only the actions of the federal government," but that his "Due Process claim survives under the Fourteenth Amendment which delineates that due process of law is to be upheld by the states and their actors."  (ECF No. 31, PageID.340-41).  The Court agrees that "the Fifth Amendment applies only to the federal government," *Siegel v. City of Germantown*, 25 F. App'x 249, 250 (6th Cir. 2001), and as such, Ingram's Fifth Amendment claim should be dismissed.

immunity from official capacity § 1983 claims:

> Because sovereign immunity extends to state instrumentalities, and the MDOC is an arm of the State of Michigan, the MDOC is entitled to sovereign immunity on the § 1983 claim as well.  Moreover, the named Defendants, in their official capacities, are similarly entitled to immunity with respect to [Plaintiff's] § 1983 claim because a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office, which is no different from a suit against the State.

*McCoy v. Michigan*, 369 F. App'x 646, 653-54 (6th Cir. 2010) (internal citations and quotations omitted).

Here, the law is clear that sovereign immunity applies to Ingram's claims for money damages against Zamenski in her official capacity as a MDOC employee.  *Id.*  Accordingly, Ingram's official-capacity claims should be dismissed.

## Individual Capacity Claims

### *Segregation*

As to his individual-capacity claims, Zamenski first argues that "Ingram claims that he was sent to segregation on January 9, 2022, the date he was reviewed on the [Out-of-Place Misconduct Ticket] by Zamenski," and because the Out-of-Place Misconduct Ticket "was pulled by Deputy Warden McRoberts on January 19, 2022, ten days later. . . .  [t]hat is the extent of the segregation classification claimed by Ingram in his Complaint."  (ECF No. 29, PageID.294).  She asserts that Ingram's "brief stay in segregation" does not amount to an "atypical and significant hardship" sufficient to trigger due process protections.  (*Id.*, PageID.299-301).

Ingram responds that his "13 days in segregation were atypical and of significant

hardship due to his decompensated mental state at the time he was placed there." (ECF No. 31, PageID.341). He argues that at the time Zamenski wrongfully placed him in segregation, he had "been off of his prescribed psychotropic medication for a considerable amount of time, and was in a decompensated state." (*Id.*). Ingram asserts that "[u]nder this particular set of circumstances, [his] being subjected to segregation for roughly two weeks while suffering from symptoms of mental illness presented a significant and atypical hardship," as he "suffered a full on manic episode after being placed in segregation." (*Id.*, PageID.342).

In reply, Zamenski argues that:

> Ingram does not claim that there was anything significant or atypical about segregation *itself* and appears to abandon any argument about his Loss of Privileges sanction. Instead, Ingram now claims that his brief stay in segregation amounted to a significant and atypical hardship "due to his decompensated mental state at the time he was placed there." However, Ingram's claimed mental state has nothing to do with either the nature or duration of his stay in segregation. Said another way, Ingram's mental state is not a prison condition, nor is it a condition of confinement imposed upon him by the MDOC.

(ECF No. 32, PageID.349-50) (emphasis in original).

Zamenski's argument that Ingram's mental health condition has no bearing on the due process analysis is incorrect. The Sixth Circuit has recently made clear that the placement in solitary confinement of a prisoner with "documented mental health issues" can amount to excessive discipline in violation of his Fourteenth Amendment substantive due process rights:

> . . . Placement of a mentally-ill detainee in solitary confinement "raises a genuine concern that the negative psychological effects of his segregation will drive him to self-harm." *Wallace v. Baldwin*, 895 F.3d 481, 485 (7th Cir. 2018). As the Third

Circuit has explained, confinement of a detainee should be assessed "in light of his mental illness," recognizing the "growing consensus" that solitary confinement "can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity." *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017). Here, J.H.'s documented mental health issues made him particularly vulnerable to the effects of solitary confinement.

Third, we are mindful of the nature and duration of J.H.'s segregation. *See Williamson*, 912 F.3d at 180 ("[T]he *Bell* Court expressly considered, inter alia, the duration of the punitive conditions.") (citing *Bell*, 441 U.S. at 543, 99 S.Ct. 1861); *Bistrian*, 696 F.3d at 374 (considering the "nature of [the pretrial detainee's] confinement" in determining whether the disciplinary segregation was excessive). J.H. was in solitary confinement for several weeks—from November 17 to December 8, 2013—before Judge Guffee ruled on his placement in segregation. J.H. was housed in an eleven-by-seven-foot cell where he was not allowed to interact with any other juveniles. These 21 days of isolation are of noteworthy duration, as "[t]here is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects." *Williams v. Sec'y Pa. Dep't of Corrs.*, 848 F.3d 549, 566 (3d Cir. 2017) (quoting Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 531 (1997)). The Third Circuit noted a study showing that "even a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium." *Id.* at 567 (quoting Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 331 (2006)). And as Justice Kennedy has described, it has "long ... been understood" that there is a "human toll wrought by extended terms of isolation." *Davis v. Ayala*, [] 135 S. Ct. 2187, 2209, 192 L.Ed.2d 323 (2015) (Kennedy, J., concurring).

In sum, considering J.H.'s age, mental health, and the duration and nature of his confinement, we conclude that the punishment imposed on J.H. was excessive. . . . This discipline was excessive given the infraction that J.H. was accused of and the unique vulnerabilities he possessed—namely his age and mental health status.[4] We

---

[4] "We do not mean to imply that each of these factors—that is, a detainee being a juvenile and mentally ill—must be present for the imposition of solitary confinement to be unconstitutionally excessive under *Bell*. *See, e.g.*, *Williamson*, 912 F.3d at 181 (holding that simply the length of the plaintiff pretrial detainee's solitary confinement could lead a "reasonable factfinder [to] conclude" that it was "excessive relative to his infractions"); *Bistrian*, 696 F.3d at 374 (concluding that given the "nature of [the plaintiff's] confinement" it could be deemed excessive). However, where these factors are present, they must be relevant to our analysis. A court cannot consider the punishment of a child while ignoring the fact that he is a child, nor can a court pretend that the effects of solitary

therefore hold that, assuming J.H.'s allegations to be true, his Fourteenth Amendment substantive due process rights were violated when he was held in solitary confinement from November 17 to December 8, 2013.

*J.H. v. Williamson Cnty., Tennessee*, 951 F.3d 709, 719 (6th Cir. 2020) (footnote in original).

Federal district courts in Michigan have followed the Sixth Circuit's directive in *J.H.*, stating that "the Sixth Circuit also recognizes that segregation more severely affects inmates with existing mental illness and cautions that assessments of solitary confinement should consider the mental health of the individual, recognizing the growing consensus that solitary confinement can cause severe and traumatic psychological damage." *Haywood v. Winn*, No. 2:20-CV-12976, 2021 WL 1192975, at *4 (E.D. Mich. Mar. 30, 2021) (quotations omitted); *see also Blaylock v. Carl*, 2023 WL 10369274, at *4 (E.D. Mich. Nov. 30, 2023) ("The undersigned agrees that while certain facts may differ, *J.H.* is instructive on whether segregation of an inmate with mental health issues can reach the level of an atypical and significant hardship."); *Thompson v. Washington*, No. 1:21-CV-683, 2022 WL 2128264 (W.D. Mich. June 14, 2022) ("[T]he Sixth Circuit recently recognized that segregation more severely affects inmates with existing mental illness. . . . While considering the mental health of the inmate, a court should remain 'mindful of the nature and duration of the confinement in segregation.'") (quoting *J.H.*, 951 F.3d at 719).

---

confinement are the same regardless of a detainee's mental health status. *See Miller*, 567 U.S. at 474, 132 S.Ct. 2455 (explaining that "imposition" of "penalties on juvenile offenders cannot proceed as though they were not children"); *Palakovic*, 854 F.3d at 225–26 (reversing a district court's dismissal of an Eighth Amendment claim brought on behalf of a mentally ill 23-year-old who was placed in solitary confinement where plaintiffs had sufficiently alleged the "conditions there were inhumane for him in light of his mental illness")."

Based on the above case law, Zamenski's argument that "numerous cases reviewing segregation stays longer than Ingram's concluded that the duration of confinement itself did not implicate a liberty interest" misses the mark, as the cases[5] she relies on do not assess confinement in segregation of a prisoner like Ingram who has "documented mental health issues." Those cases also predate the Sixth Circuit's published decision in *J.H.*, which makes clear that the placement of a mentally-ill prisoner in segregation can, in certain situations, amount to a violation of his Fourteenth Amendment substantive due process rights. *See J.H.*, 951 F.3d at 719-20.

Similarly, to the extent Zamenski argues that she is entitled to qualified immunity because "based on controlling case law, [she] would have believed that administrative segregation alone does not involve an 'atypical and significant' hardship implicating a protected liberty [interest]," such argument again overlooks the binding precedent established by the Sixth Circuit in *J.H.* In analyzing whether there was a clearly established right at the time of the incidents in *J.H.*, the Sixth Circuit held that "[w]e cannot say that the right at issue was established with sufficient specificity as to hold it clearly established **as of 2013**, the time of these incidents" because "[m]any of the cases recognizing what a punishing experience placement in solitary confinement can be—especially for juveniles and those with mental health issues—have been issued after 2013." *J.H.*, 951 F.3d at 720 (emphasis added). In contrast, Ingram's claim here arises out of his placement in

---

[5] Zamenski cites to *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995); *Jones v. Baker*, 155 F.3d 810, 812-23 (6th Cir. 1998); *Mackey v. Dyke*, 111 F.3d 460 (6th Cir. 1997); *Bradley v. Evans*, 229 F.3d 1150 (6th Cir. 2000); and *Hubbard v. Theut*, No. 2:19-CV-52, 2019 WL 1198536 (W.D. Mich. Mar. 14, 2019). (ECF No. 29, PageID.296-97).

segregation in 2022, which is after the *J.H.* decision was published in 2020.  Thus, during the relevant time here, it was clearly established that the arbitrary placement in segregation of a mentally ill prisoner could amount to a violation of his Fourteenth Amendment due process rights.  For these reasons, Zamenski is not entitled to qualified immunity on Ingram's claim against her based on his placement in segregation.[6]

Finally, the parties dispute the amount of time Ingram spent in segregation; Zamenski argues that Ingram was placed in segregation for 10 days, while Ingram contends it was 13 days.  A review of the evidence reflects that Ingram was in segregation for up to 13 days, as MDOC medical records document that Ingram was placed in "restrictive housing" or segregation on January 9, 2022, and that it was not until January 21, 2022, that Ingram was "returned to general population."  (ECF No. 1, PageID.22-23).  Viewing this evidence in the light most favorable to Ingram as the non-moving party, the record reflects that Ingram was placed in segregation for 13 days.

---

[6] Zamenski argues in passing for the first time in her reply brief that "there is no evidence on this record that Zamenski had any knowledge of a claimed 'decompensated mental state' at the time Ingram was placed in segregation but, even if she had, such a mental state would only serve to corroborate the disruptive behavior Zamenski noted [] that led to Ingram's placement in segregation." (ECF No. 32, PageID.349).  That argument lacks merit.  First, it is inappropriate to raise a new substantive argument in a reply brief, *Brown v. PSCU, Inc.*, No. 20-11510, 2022 WL 17540567, at *3 (E.D. Mich. Dec. 8, 2022), and, in light of the case law discussed above, Zamenski could have raised the issue in her motion.  Second, it is well documented in the MDOC medical records that "Prisoner Ingram has been receiving mental health services since 2010" (ECF No. 1, PageID.22-23), and that during the time of the incident, Ingram was in a "decompensated mental state" (ECF No. 29-3, PageID.318).  Third, and relatedly, in her declaration, Zamenski did not disclaim knowledge of Ingram's long history of documented serious mental health issues.  *See Blaylock*, 2023 WL 10369274, at *6 ("Neither [defendants] Dye nor Jacobs has submitted an affidavit disputing Blaylock's alleged mental issues or disclaiming knowledge of them.  Carl's affidavit failed to address these issues or give reason for Blaylock's continued stay in segregation beyond his initial sanction.").

While the 13 days of segregation in this case are less than the 21 days of segregation in *J.H.*, the Sixth Circuit expressly stated that "[t]here is not a single study of solitary confinement wherein non-voluntary confinement that last for longer than 10 days failed to result in negative psychological effects," studies show that "even a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium," and individuals with "documented mental health issues" are "particularly vulnerable to the effects of solitary confinement." *J.H.*, 951 F.3d at 719-20.  Moreover, the medical evidence reflects that Ingram's mental health deteriorated rapidly since being placed in segregation on January 9, 2022, as he was documented exhibiting "significant signs and symptoms of mania" just one day later on January 10, 2022, and by January 11, 2022, he was "found by custody staff in the process of fashioning a noose (using a bed sheet) to hang himself," "placed into an observation cell," and put on a "HIGH risk suicide management plan."  (ECF No. 1, PageID.22-23). Viewing the evidence in the light most favorable to Ingram, a reasonable juror could conclude that even a few days in segregation exacerbated his mental illness to such a level that it drove him to attempt suicide.  *See J.H.*, 951 F.3d at 719 (". . . confinement of a detainee should be assessed 'in light of his mental illness,' recognizing the 'growing consensus' that solitary confinement 'can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity.'") (quoting

*Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017)).[7]

For all of these reasons, Zamenski is not entitled to summary judgment on Ingram's due process claim based on his placement in segregation.

### *Loss of Privileges*

Finally, Zamenski argues that "loss of privileges also does not amount to any atypical and significant hardship that triggers a due process analysis and or supports a Fourteenth Amendment due process claim." (ECF No. 29, PageID.297-98). Zamenski asserts that she "could not and did not impose any sanctions" of 15 days' loss of privileges because the Out-of-Place Misconduct ticket was "pulled before a misconduct hearing was ever held," and so "Ingram would not have served, and did not serve, any sanctions" arising out of that misconduct ticket. (*Id.*, PageID.300).

In response, Ingram argues that "[t]he misconduct ticket ended up getting pulled due to no fault of [Zamenski's]," and "[h]ad it not been for the Misconduct Sanction Assessment and Deputy Warden McRoberts ultimately pulling the ticket, Plaintiff would have remained found [sic] guilty and been forced to serve 15-days of LOP." (ECF No. 31, PageID.342). In other words, Ingram appears to concede that he never actually served a

---

[7] Zamenski's argument that "[e]ven if Ingram had a protected liberty interest in his classification to segregation, which he does not, Ingram's claim still fails because the [Out-of-Place Misconduct Ticket] was pulled pursuant to MDOC policy, meaning that Ingram was found not guilty and received no sanctions" (ECF No. 29, PageID.299), lacks merit. As Zamenski acknowledges in her summary judgment motion, Ingram's claim is that he "was arbitrarily sent 'to punitive segregation simply because [Zamenski] disagreed with [his] attempting to exercise [his] right to a hearing.'" (ECF No. 29, PageID.298). In other words, the fact that the Out-of-Place Misconduct ticket was later pulled due to Ingram's mental illness does not change the fact that Ingram was placed in segregation for 13 days, regardless of whether it was a result of a formal sanction or, as Ingram contends, an arbitrary and punitive action by Zamenski in response to his attempt to exercise his right to a hearing.

sanction of 15-days loss of privileges.

In any case, even if Ingram was in fact sanctioned and served 15 days loss of privileges, the law in this regard is clear that "[s]uch sanctions do not affect the duration of [Ingram's] sentence or impose an atypical and significant hardship on [him]" such that it would implicate his due process rights. *Shivers v. Briske*, No. 1:24-CV-298, 2024 WL 2208123, at *8 (W.D. Mich. May 16, 2024); *see Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004) (holding that a fourteen-day loss-of-privileges sanction did not implicate the due-process clause); *Alexander v. Vittitow*, 2017 WL 7050641, at *3 (6th Cir. Nov. 9, 2017) ("The sanction imposed to Alexander's misconduct charge—thirty days' loss of privileges—did not implicate a protected liberty interest because it did not affect the length of his sentence and did not amount to an atypical and significant hardship."). While the Sixth Circuit has held that the placement in segregation of a prisoner with mental illness may implicate due process, it has not held the same in the context of loss of privileges. Thus, Zamenski is entitled to summary judgment on Ingram's due process claim based on a sanction of 15-days' LOP.

## III.   CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that defendant Zamenski's Motion for Summary Judgment **(ECF No. 29)** be **GRANTED IN PART** as to (a) Ingram's official capacity claims; (b) his individual capacity due process claims under the Fifth Amendment; and (c) his individual capacity due process claim under the Fourteenth Amendment based on a sanction of 15 days' Loss of Privileges, but **DENIED IN PART** as to Ingram's individual capacity due process claim under the Fourteenth

Amendment based on his placement in segregation.


Dated: June 5, 2024                                          s/David R. Grand
Ann Arbor, Michigan                                      DAVID R. GRAND
                                                                     United States Magistrate Judge


## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.  A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

**<u>CERTIFICATE OF SERVICE</u>**

  The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 5, 2024.

s/Eddrey O. Butts   
EDDREY O. BUTTS
Case Manager
